## MILLARD et al. v. CHASE.

(Circuit Court of Appeals, First Circuit. April 24, 1901.)

### No. 367.

1. PATENTS—PATENTABILITY—ISSUES.

The rule applied that, with reference to questions of patentability, and of the range of the claims in a patent issued to an inventor, in a suit on such patent, the court will not allow parties to frame their issues in such way as to take from it the scrutiny of such questions.

2. SAME—CONSTRUCTION OF CLAIMS—LIMITATION BY PROCEEDINGS IN PATENT OFFICE.

Where the invention of a patentee is of a narrow and doubtful character, necessarily to be carefully limited, and substantial objections to his claims were made by the patent office, to which he yielded, he must be held to the result of the proceedings on his application, and be restricted thereby.

3. SAME—INVENTION—SHOE UPPERS.

The Chase patent, No. 620,278, for a shoe upper, claim 3, is void for lack of patentable invention.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Benjamin Phillips, for appellants.
George H. Maxwell, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge.    This appeal arises on patent No. 620,-278, issued to George W. Chase on February 28, 1899, on an application filed on February 24, 1896.  The general statement of the invention in the specification is that it relates to that class of shoes wherein the upper is made without a heel seam, and that it has for its object "the production of a shoe without a heel seam, formed from a blank cut with the minimum of waste and labor, and obviating the removal of portions of material from the upper to properly shape the heel line of the ankle portion when compleود; the said heel line being reinforced by an integral stay portion of the upper."    The patent contains three claims.   The first and second claims are not now in issue, but it is necessary to state them, in order that the relation of the third claim to the case may be properly understood.   The claims are as follows:

"(1) A unitary shoe upper, comprising a toe portion, continuous heel portion, and ankle or instep portions, the back of the upper above the heel portion having two symmetrically located, upright slits therein, outwardly curved at their middle portions and inwardly curved between such middle portions and their out-turned upper and lower ends, to form a strip between them having its edges correspondingly curved and integral with the upper at top and bottom, substantially as described.

"(2) A shoe upper provided in the vicinity of the heel with two vertical cuts having irregular edges, forming a heel stay integrally attached at its opposite ends to said upper, the irregular edges of said upper at said cuts being joined or seamed together beneath the stay in a single straight line to crimp or mold the shoe upper to fit the foot, and the stay thereafter stitched down upon and to conceal the said single line joint or seam, the adjacent ends of the said cuts being directed outwardly or made divergent to smoothly blend the crimped and stayed portions of the upper into the material of the said upper at the ends of the stay, and thereby avoid a sharp point or pucker at said stay ends, substantially as described.

"(3) A shoe made from a blank or pattern provided at the back of the upper with incisions or slits having a reinforcing stay strip between them, said stay strip being integral with the upper adjacent the counter line, the slitted upper being sewed together at the rear beneath said stay strip to form a seam, said stay strip extending over the sewed seam and being stitched to the upper at the opposite sides of the said seam by rows of stitches close to the edges of said stay strip, said rows of stitches extending from adjacent the counter line uninterruptedly throughout the entire length of the stay strip on each side thereof, as and for the purpose described."

The circuit court found the first and second claims were not infringed, but it sustained the third claim, and held that the respondents below infringed it.   One defense in the circuit court was based on a patent to John S. Powell for improvements in back pads, used beneath harness saddles, being patent No. 539,300, issued on May 14, 1895, on an application filed on January 12, 1895, and thus, on the

face of the record, anticipating the patent in suit. The opinion of the learned judge who heard this case in the circuit court said that this patent was too remote as an anticipation. On the arguments before us, the respondents, now the appellants, rested their case entirely on this patent to Powell; but it is a thoroughly settled rule that, as to patentability and the range of the claims in a patent, inasmuch as these matters concern the public at large, the court will not allow parties to frame their issues in such way as to take from it the scrutiny of all the questions which may be involved. This rule applies to this case, and the court declines to rest it where the respondents offered to rest it. Fortunately, notwithstanding the position taken by the respondents, the line of discussion when the appeal was heard branched out to cover the propositions which we will consider, so that we will not pass through them without a guide.

In addition to the patent by Powell, two patents to Alfred Bélaire become of substantial interest in the case, and will be referred to again. One is No. 554,229, issued on an application filed on November 22, 1895, and the other is No. 613,958, issued on an application filed on August 27, 1896. With reference to the later patent to Bélaire, it was adjudicated on an interference proceeding in the patent office that he has priority over Chase. Chase now claims priority of invention with reference to all three patents,—that is, the one to Powell and the two to Bélaire; but, with regard to the later patent to Bélaire, the issue, as we have said, was fully determined against Chase on the interference proceeding. Chase did not appeal, but narrowed his claims to meet the adjudication. As to the other two patents, the evidence is so clearly of the character which was rejected by this court on the issue of priority in Brooks v. Sacks, 26 C. C. A. 456, 81 Fed. 403, that, without attempting any explanation of particulars, we decline to award Chase priority. Thus it follows that the three patents enumerated were parts of the state of the art at the time of Chase's invention, even if not strictly anticipatory.

Before coming to the merits of the case, it is necessary to observe on the proceedings in the "file wrapper," so called,—that is to say, in the patent office,—with reference to the application for the patent in issue. The topic was fully discussed by us, and carefully explained, in Reece Button-Hole Mach. Co. v. Globe Button-Hole Mach. Co., 10 C. C. A. 194, 61 Fed. 958, and, so far as the rules of law are concerned, we add nothing to what we there said. All which we have occasion to do is to apply them to the particular circumstances of this case. As we have seen, Chase's application was pending in the patent office four days over three years. It was very extensively agitated, and the claim now an issue, as originally drawn, was twice rejected. The position of the office was thoroughly discussed, and was fully understood by the applicant. It cannot be questioned that the issues made by it were substantial, and not incidental, while the invention is of a narrow and doubtful character, and necessarily to be carefully limited; so that the

108 F.—26

patentee must be held to the results of the proceedings on his application, and be restricted thereby. In this respect the case is altogether different from what it would have been if the invention had been of a fundamental character, and the inventor was sought to be deprived of substantial rights by reason of incidental action on the part of the examiners.

Coming, now, more particularly to the facts of the case before us: The specification of the patent in issue refers to the necessity of obtaining "the desired crimped or molded formation to the sides of the upper," so that there will be "no sharp pucker, or point, where the ends of the stay strip blend into the integral material of the shoe upper or blank." It provides for "symmetrically disposed slits," so cut as "to leave an intermediate stay strip of material integral at the top and bottom with the blank or upper." It directs that the edges of the blank or upper, along the line of the slits, shall be stitched together under the stay strip which is left by the slits, and that then the stay strip shall be "laid and stitched over and upon, and to conceal, the seam" thus made between the edges of the upper, in order to get "the desired crimped or molded formation" already referred to. It also says:

"The curves of the slits, or the outer walls or boundaries thereof, are such that the adjacent ends of the two slits are made divergent, or to spread outwardly; the divergence at the lower ends of the stay strip being preferably wider, or more open, than at the top thereof."

The drawings annexed to the specification are referred to as showing this peculiar form of the slits. The feature of retaining the material integral with the blank at the top and bottom, and the feature of divergence, as shown in the citations which we have made, are insisted on throughout the specification and all the drawings attached thereto; and both are expressly carried into the first and second claims. Neither of them, however, appears in the third claim. In the respondents' shoe, the slits omit this feature of divergence, and are substantially cut on the lines of a crescent, the ends approaching each other, instead of diverging. In this respect the slits are formed in the manner shown in the specification of the patent to Powell, already referred to. This states that the object of the invention was to produce "a back pad with a concave top, to enable the saddle to fit nicely upon it, and, further, to produce this concavity in a cheap and simple manner, and in a way to enable the pad to be finished very neatly and without expense." It shows that two crescent-shaped slits are cut on opposite sides of the center, leaving a strip nearly elliptical in form.

The application as originally filed by Chase in the patent office contained, and insisted on, all the same particulars of a strip integral at the top and bottom of the blank, and on the peculiar form of the slits shown in the patent as issued. In the latter particular, and in the less important particular of stitching, instead of rivets, and also in the suggestion of making use of the strip as a stay, and in the fact that Chase was shaping the ankle of a shoe, which is exposed to observation, and needs to be done with great neatness.

while Powell was dealing with a pad, which is covered from sight by the saddle, and in these particulars alone, Chase differed from Powell. It is true that in some of the claims as originally made by Chase he did not in terms refer to the precise form of curvature of the slits stated in his specification; but, in view of the exact description of the form of the slits insisted on in his specification and shown by his drawings, and, further, in view of the necessarily narrow nature of inventions of this class, the particulars thus shown by him indicate the nature of his conception, and limit it accordingly. The first and second claims of his patent, as we have said, embody these details; and it is quite probable that, with these details kept in mind, and in view of the principles announced by us in Watson v. Stevens, 2 C. C. A. 500, 51 Fed. 757, as to the support given by the fact of success where others have failed, and also in view of the rules restated by us in Heap v. Suffolk Mills, 27 C. C A. 316, 82 Fed. 449, with reference to the question of invention as applied to analogous uses, these claims may be sustained, although they relate to the art of fitting and strengthening common articles of wear, as to which there is ordinarily no patentability, and although Powell's device concerns an art which is in one sense the same as that to which the patent in issue appertains.

Respondents' device does not have the diverging edges insisted on by Chase's specification, but it forms the slits with converging ends. Therefore, if covered at all, it is covered only by the third claim. This claim omits the feature of a stay strip of material integral at each end, and also, what is more important, the feature of divergence, or outward spreading, of the ends of the slits. Therefore, it was a departure from Chase's invention, and is void. The history of the claim emphasizes this fact. It was first introduced into the case as the result of a suggestion by the examiner, made in August, 1897. As first drawn, it was filed on September 3, 1897, as follows:

"(3) A shoe made from a blank or pattern having at the back of the upper incisions or slits forming a reinforcing stay piece, the lower portion of the incisions extending in divergent lines, and sewed together at the rear to form a seam, said stay piece extending over the sewed seam and stitched to the upper at opposite sides of the said seam, as and for the purpose described."

As thus drawn, it went into the interference to which we have already referred, and was rejected as anticipated by Bélaire. Indeed, in that form, it was anticipated by both of Bélaire's patents, each of which showed a stay strip cut out of the blank of the upper as a tongue; that is to say, integral only at the lower end, the first with slits cut on compound curves, and the other on "curved lines," without other restrictions. His construction, in all respects except so far as the form of the slits is concerned, and except that Bélaire's stay strip was integral only at the lower end, was the same as that of the patents in suit, fully accomplishing the reinforcement which Chase made one of the objects of his invention. In other words, each of Bélaire's patents had everything found in claim 3 as first presented.

The claim was afterwards amended on October 18, 1898, to read as follows:

"(3) A shoe made from a blank or pattern having at the back of the upper incisions or slits forming a reinforcing stay piece, and sewed together at the rear to form a seam, said stay piece extending over the sewed seam and being stitched to the upper at the opposite sides of the said seam, as and for the purpose described."

This was rejected on the patent to Powell, and this rejection was acquiesced in. The claim was thereupon again amended by inserting the words now found in it, as follows: "Said stay strip being integral with the upper adjacent the counter line," and "by rows of stitches close to the edges of said stay strip, said rows of stitches extending from adjacent the counter line uninterruptedly throughout the entire length of the stay strip on each side thereof." As we have already shown, in view of the course of this patent in the patent office, and the necessarily narrow character of an invention of this nature, it must be held that Chase acquiesced in its rulings with reference to the third claim, and, therefore, that he accepted the proposition that it represented no patentable invention, except with the addition of the words which he inserted, as we have said. If there was no patentability in the claim without the insertion of these words, they could add nothing in that direction, as they represent nothing which involves any invention, or of which the patent law could take any notice. Therefore, both because the third claim, in that it omits the feature of a stay strip integral at both ends, and the more important feature of slits with diverging curves at their extremities, departs from Chase's invention, if he made one, and also because Chase's acquiescence in the rulings of the patent office left nothing in this claim of a patentable character, we are compelled to hold that it is void. As the first and second claims were not infringed, and the third claim is void, the bill should have been dismissed.

This appeal comes to us on an injunction issued, with a decree for an accounting, after a hearing on bill, answer, and proofs. Therefore, in accordance with the settled practice, the merits of the case are fully before us, and we are enabled to dispose of it finally.

The decree of the circuit court is reversed, and the case is remanded to that court, with directions to dismiss the bill, with costs; and the appellants will recover the costs of appeal.