UNITED STATES CONSOL. SEEDED RAISIN CO. v. SELMA FRUIT CO.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1912.)

No. 1,909.

1. PATENTS (§ 310*)—SUIT FOR INFRINGEMENT—PLEADING.
   The failure of the answer in a suit for infringement, in pleading prior use, to state the place of such use, as required by Rev. St. § 4920 (U. S. Comp. St. 1901, p. 3394), is ground for exception for insufficiency under equity rule 61 (29 Sup. Ct. xxxii) and, if not excepted to or otherwise objected to in the trial court, the objection is waived.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 507–540; Dec. Dig. § 310.*]

2. PATENTS (§ 324*)—SUIT FOR INFRINGEMENT—ISSUES IN APPELLATE COURT.
   In determining the validity of a patent in an infringement suit, an appellate court is not limited by the scope of the decision of the court below, but will consider all matters material to the question of validity.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 600–606; Dec. Dig. § 324.*]

3. PATENTS (§ 167*)—PROCESS PATENT—CONSTRUCTION OF CLAIMS—"SUBSTANTIALLY AS SET FORTH."
   The words "substantially as set forth" at the end of a claim in a process patent have the effect of importing into the claim the particulars of the specification relating to the process to illustrate its operation, but not the function or operation of the mechanism there described, nor can they extend the patent beyond the claim which bounds the patentee's rights.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. § 167.*
   For other definitions, see Words and Phrases, vol. 7, p. 6742.]

4. PATENTS (§ 7*)—PROCESS—FUNCTIONS OF MACHINES.
   A valid patent cannot be obtained for a process which involves nothing more than the functions or operative effect of machines which are the subjects of other patents or applications.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 6; Dec. Dig. § 7.*]

5. PATENTS (§ 328*)—NOVELTY—PROCESS OF TREATING RAISINS.
   The Forsyth patent, No. 611,782, claims 7 to 12, for a process of treating raisins, which consists of heating and then quickly cooling them, to produce a hard or brittle condition, and then subjecting them to abrasive and separating treatment whereby they are stemmed and cleaned, are void for lack of novelty in view of the state of the prior art.

Appeal from the Circuit Court of the United States for the Northern Division of the Southern District of California.

Suit in equity by the United States Consolidated Seeded Raisin Company against the Selma Fruit Company. Decree for defendant, and complainant appeals. Affirmed.

The complaint alleges the ownership by the complainant of patent No. 611,782, dated October 4, 1898, granted to William Forsyth and its infringement by the defendant.

The patent is for new and novel improvements in the preparation of fruit, and the invention is for an art or process in the preparation of dried fruit, and more particularly of raisins. In the specification it is set forth that it "has for its objects to improve the quality of the fruit and to effect the complete breaking off and separation of the stems by bringing the fruit into

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such a condition that the fruit and points of attachment of the stems are hard and brittle and stemming and cleaning the fruit while in such condition." By the process described, "the fruit is first heated and then quickly cooled, and thereby brought to the desired hard and brittle condition. The breaking off of the stems is effected by abrasion, and the separation of the stems and other material is effected by a separating treatment, such as by screening or blowing or otherwise, all while the fruit and stems are in a hard and brittle condition."

In the specification the process is described as having been "designed, primarily, for the treatment of raisins, to which it is peculiarly adapted. In the treatment of raisins the bunches are first broken up and the long stems partially or wholly separated in any usual manner, and the raisins are spread out in trays in loose condition, and the trays are placed in the heater. The temperature to which the raisins are heated depends upon the condition of the raisins, and the right degree of heat for the best results is readily determinable in practice. Care must be taken not to burn the raisins, but in some instances the temperature may be raised as high as 150° Fahrenheit, more or less, the degree of heat being governed to some extent by the duration of the treatment and a temperature in the neighborhood of 100° Fahrenheit or lower being at times sufficient, if sufficiently prolonged. After the proper condition of the raisins has been reached they should be transferred to the cooler, where they will be quickly cooled to a temperature in the neighborhood of normal temperature or lower, and will thereby be brought to a hard and brittle condition and the points of attachment of their stems made brittle. This hard and brittle condition will continue only for a limited time, and the stemming and cleaning should therefore be performed promptly or within a few hours. In the stemming and cleaning the raisins are subjected to an abrasive treatment, whereby the butt-stems are broken off at their points of attachment to the raisins, and to a separating treatment, such as a sieving or screening, whereby the detached stems and other foreign matter are separated, which stemming or screening may be supplemented or replaced by other suitable separating treatment, such as blowing, the abrasion and screening being conjointly effected by the inclined riddles of the stemming and cleaning apparatus and a subsequent blowing being effected by the fan-blower shown. The hard and brittle condition of the raisins and of the stems and points of attachment thereof by eliminating to a large extent the usual soft, gummy, sticky, and adhesive condition permits the butt-stems to be readily and reliably broken off at their points of attachment by slight abrasion or rubbing, whereas these stems and their points of attachment are normally so pliable and tough that they can only be effectively detached by hand-picking, and also facilitates the separation of the stems and foreign material from the fruit. This process of treatment also possesses the advantage of improving the quality of the raisins, as it brings about a condition of the raisins such that they will retain for a long period a dark and an attractive appearance, as is desirable, and this is particularly valuable to raisins that are to be placed upon the market in seeded condition, as the tendency to discolor, sugar, or crystallize is much greater in these seeded raisins than in unseeded raisins."

In claiming invention for an art or process the inventor is required to point out at least one form of apparatus by which the process may be practiced. In the specification reference is made to the accompanying drawings, illustrating apparatus adapted to carrying out the process. The apparatus shown comprise a heater and cooler and a stemming and cleaning machine which it is said are examples of apparatus that may be used in carrying out the process of treatment. The heater and cooler is described in an application for a patent filed by William Forsyth on September 30, 1897, under serial number 652,230; and the stemming and cleaning apparatus in a patent issued to George Pettit, Jr., dated April 26, 1896, and numbered 603,029.

In appellant's brief reference is also made to the patent issued to George Pettit, No. 619,693, for fruit-seeding machine recently sustained by this court in Kings County Raisin & Fruit Co. v. United States Consolidated Seeded Raisin Co., 182 Fed. 59, 104 C. C. A. 499.

The patent in suit has twelve claims. The first six claims are for process

treatments of· "dried fruit." The second six claims are for process treatments of "raisins."

The complainant limits its charge of infringement against the defendant to these last six claims, with respect to which it is charged that the defend-. ant has used and practiced the process in the treatment of raisins. These claims are as follows:

"7. The process of treating raisins which consists in heating the raisins and then cooling them, substantially as set forth.

"8. The process of treating raisins which consists in heating the raisins and then subjecting them to a current of air whereby they are quickly· cooled, substantially as set forth.

"9. The process of treating raisins which consists in subjecting the raisins to a current of warm air whereby they are heated and then subjecting them to a current of cool air whereby they are quickly cooled substantially as set forth.

"10. The process of treating raisins which consists in heating the raisins and then cooling them, whereby the points of attachment of the stems are detached, substantially as set forth.

"11. The process of treating raisins which consists in heating the raisins and then cooling them, whereby the raisins and the points of attachment of the stems are rendered brittle, and then subjecting the raisins to abrasive and separating treatment, whereby they are stemmed and cleaned, substantially as set forth.

"12. The process of treating raisins which consists in subjecting the raisins to a current of warm air whereby they are heated, and then subjecting them to a · current of cool air whereby they are quickly cooled, and then subjecting them to abrasive and separating treatment whereby they are stemmed and cleaned, substantially as set forth." ·

The defendant in its answer denied ,the material allegations of the complaint, and alleged, among other things, that the process claimed by the complaint in the patent was not new, and was not an invention, but a mere· aggregation of· acts operating separately and independently of one another· and each of said succession of acts, such as the heating of raisins, and the cooling of raisins, and the removal of the butts or cap-stems by abrasive treatment had been long and publicly known before the said alleged invention described in the said letters patent, and did not require invention in the then state of the art to make use of the process described. It was further alleged by the defendant on information and belief that Forsyth, the patentee, was not the inventor or discoverer of any material and substantial part of the thing patented, and "that previous knowledge and use of the substantial· and material parts of said alleged invention was had by Edwin Hayden· whose residence is in the city and county of San Francisco, state of California, * * * that the said Edwin Hayden and his associates and employés in business knew and used the said process in the treatment of raisins about the year 1883 continuously for many years, and that such knowledge and use was public, without concealment, and was by him communicated to many others during said time, and that connected · with said use he used machinery of his own construction suitable for the purpose." And ·it was alleged that such knowledge and use, was possessed and practiced by many others, to the defendant unknown, and the defendant prayed leave, when discovered, that it might be permitted to insert and set forth the names in an amended answer. In an amended answer the defendant alleged and set forth the names and residences of a number· of persons who it was alleged had knowledge and use of the process long prior to the time when it was claimed to have been invented by Forsyth. It was also. alleged that long prior to the supposed invention and discovery of the process by Forsyth it had been discovered and patented in a number of patents which were set forth in the amended answer, and that .the alleged invention had also been described in a printed publication in book form, entitled: "The Raisin Industry. A Practical Treatise on the Raisin, Grapes, Their History, Culture and Curing, by Gustav Eisen, San Francisco. H. S. Crocker & Company, Stationers and Printers, 1890." The answer also denied infringe-; ment. ·

Testimony was taken upon the issue presented by the pleadings, and after a hearing upon the testimony the court held the patent void for lack of novelty, and entered a decree dismissing the bill. The case is here on complainant's appeal from the decree.

John H. Miller and Wm. K. White, for appellant.

Frederick S. Lyon, for appellee.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

MORROW, Circuit Judge (after stating the facts as above). [1] The first objection urged by the complainant to the proceedings in the court below is that defendant did not in its answer plead the prior use of the process as therein alleged in accordance with the requirements of the statute.

Section 4920 of the Revised Statutes (U. S. Comp. St. 1901, p. 3394) provides, among other things:

"In any action for infringement the defendant may plead the general issue, and, having given notice in writing to the plaintiff or his attorney thirty days before, may prove on trial any one or more of the following special matters: * * * That it had been in public use or on sale in this country for more than two years before his application for a patent; * * * and in notices as to proof of previous invention, knowledge, or use of the thing patented, the defendant shall state * * * where and by whom it had been used. * * * And the like defenses may be pleaded in any suit in equity for relief against an alleged infringement: and proofs of the same may be given upon like notice in the answer of the defendant, and with the same effect."

This being a suit in equity, the notice required by the statute was given in defendant's answer, and the amendment thereto; but it appears with respect to the use of the alleged invention by Edwin Hayden his residence was given as being in the city and county of San Francisco, and the time of his use of the process from about the year 1883 continuously for many years, but it is not alleged where the process was used. The defendant gave notice of the person who it was alleged had used the process, and his residence, and the time when it was used. If this notice was not deemed sufficient, it was open to the complainant to except to the answer for insufficiency on the ground that the place of use had not been stated. Having failed to interpose such an exception to the answer, the defendant now contends that under the sixty-first equity rule (29 Sup. Ct. xxxii) the answer must be deemed and taken to be sufficient. That rule provides for exceptions to answers on the ground of insufficiency, and, where no exceptions are filed, "the answer shall be deemed and taken to be sufficient." Defendant makes the further answer to this objection that it was not urged in the Circuit Court, and it has not been assigned as error on this appeal. It appears from the record that all the particulars, including the place of use, were stated in the evidence, and, although this evidence was objected to by the complainant, it does not appear that the complainant was in any way prejudiced by the omission of the allegation from the answer, or the introduction of the evidence. The complainant had abundant time in which to in-

vestigate the facts alleged and make such showing in rebuttal as the facts warranted.

We think, under the circumstances, the objection must be deemed to have been waived. In any event, the evidence was admissible without notice to show the state of the art. Morton v. Llewellyn, 164 Fed. 693, 694, 90 C. C. A. 514, and that is sufficient for this case.

[2] The appellant contends that the decree of the lower court dismissing the bill was based solely on the ground of anticipation as evidenced by the prior use of appellant's process by one Hayden, and the disclosure of the process in a book entitled, "The Raisin Industry," by Gustav Eisen, and that the only question involved in this appeal is whether or not the lower court was correct in so holding. The court expressly stated that its decision was based upon the lack of novelty in the process. It is true that the court in its opinion referred to the prior use by Hayden and the book on "The Raisin Industry," but these references were clearly for the purpose of showing the state of the art at the time of the alleged invention by Forsyth. It was the duty of the court to read and construe the claims and specification of the patent in the light of a knowledge of the state of the art at the time the patent was issued. This the court did, and determined in the light of that knowledge that the process lacked novelty.

But, whatever may be deemed to be the scope of that decision, this court will not be limited by its terms. As said by the Circuit Court of Appeals for the First Circuit in Millard v. Chase, 108 Fed. 399, 401, 47 C. C. A. 429, 431:

"It is a thoroughly settled rule, as to patentability and the range of the claims in a patent, inasmuch as these matters concern the public at large, the court will not allow parties to frame their issues in such a way as to take from it the scrutiny of all the questions which may be involved."

The rule applies to this case, and requires us to examine the range of the claims and all the material questions involved in the patentability of the process in controversy.

We will first consider the range of the claims. The process as there set forth may be applied to either dried fruit or raisins. We are only concerned in this case with its application to raisins, as described in claims numbered 7, 8, 9, 10, 11, and 12.

The seventh claim is for "the process of treating raisins," the essential elements of which consist "in heating the raisins and then cooling them."

The eighth claim is for the same heating process of treating raisins, with the added element, "and then subjecting them to a current of air," whereby they are "quickly cooled."

The ninth claim is for the treatment of raisins, the essential elements of which consist in subjecting them to "a current of warm air," whereby they are heated, and then subjecting them to "a current of cool air," whereby they are "quickly cooled."

The tenth claim returns to the essential element of the primary method of the seventh claim in treating the raisins, "which consists in heating the raisins and then cooling them," with the added effect, "whereby the points of attachment of the stems are rendered brittle,

and then subjecting them to abrasive treatment whereby the stems are detached."

The eleventh claim repeats the essential elements of the tenth claim with the added effect, "whereby the raisins and the points of attachment of the stems are rendered hard and brittle, and then subjecting the raisins to abrasive and separating treatment, whereby they are stemmed and cleaned."

The twelfth claim is a combination of the ninth and eleventh claim, having the essential elements of the ninth claim, consisting of "a current of warm air" for heating the raisins, and "a current of cool air" whereby the raisins are "quickly cooled," and the essential element of the eleventh claim, "subjecting the raisins to abrasive and separating treatment whereby they are stemmed and cleaned."

The process as here described and claimed does not appear on its face to be either new or novel. The treating of raisins by "heating the raisins and then quickly cooling them," as described in the seventh claim, is certainly not new or novel. There is not a cook in the country who has had occasion to prepare dried fruit or raisins for domestic purposes who has not practiced the art of "heating and cooling them." If we go a step further, and apply "a current of hot air" to heat or dry the raisins, we do not add anything new or novel to the method of treatment; nor do we do so if we then add "a current of cool air" whereby the raisins are "quickly cooled." Currents of air for heating and cooling purposes are old methods and well known in the treatment of dried fruits and raisins.

[3] We come next to the effect of "heating and cooling" the raisins. It is claimed that, if they are "quickly cooled," the points of attachment of the stems are rendered brittle, and, if then subjected to abrasive treatment, the stems are detached and cleaned; but the public is not informed by these claims as to the particular method of procedure by which such results are to be accomplished. It is true that each claim refers to the specification accompanying the application in the usual phrase, "substantially as set forth." These words have the effect of importing into the claims the particulars of the specification relating to the process to illustrate its operation, but not the function or operation of the mechanism there described. The specification does not add to or detract from the claim. The patent cannot be extended beyond the claim. That bounds the patentee's rights. Wood Paper Patent, 90 U. S. 566, 606, 23 L. Ed. 31; Keystone Bridge Co. v. Phœnix Co., 95 U. S. 274, 278, 24 L. Ed. 344; Railroad Company v. Mellon, 104 U. S. 112, 118, 26 L. Ed. 639; Western Electric Co. v. Ansonia Co., 114 U. S. 447, 452, 5 Sup. Ct. 941, 29 L. Ed. 210; McClain v. Ortmayer, 141 U. S. 419, 423, 12 Sup. Ct. 76, 35 L. Ed. 800; Cimiotti Unhairing Co. v. Am. Fur. Ref. Co., 198 U. S. 399, 410, 25 Sup. Ct. 697, 49 L. Ed. 1100.

[4] The apparatus pointed out by Forsyth as suitable for carrying out the process of treatment embodied in his invention includes a heater and cooler, and stemming and cleaning mechanism. The heater and cooler had been made the subject of an application for a patent filed September 30, 1897. The application for a patent for

the process in controversy was filed June 23, 1898. Whether a patent has been issued for the heating and cooling mechanism does not appear in the record; but the fact that the applicant claimed the apparatus as an invention prior to making the claim for a process is sufficient of itself to eliminate the function or operation of that apparatus from the claim of invention for the process. The same is true of the stemming and cleaning apparatus for which a patent was issued to George Pettit in 1896. This is also the general rule applicable to all processes. "It is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it." Corning v. Burden, 56 U. S. (15 How.) 252, 268 (14 L. Ed. 683). "It is equally clear, however, that a valid patent cannot be obtained for a process which involves nothing more than the operation of a piece of machinery, or, in other words, for the function of a machine." Risdon Iron & Locomotive Works v. Medart, 158 U. S. 68, 77, 15 Sup. Ct. 745, 748 (39 L. Ed. 899). "Where the process is simply the function or operative effect of a machine, the above cases (referring to Corning v. Burden and Risdon Iron Works v. Medart and others) are conclusive against its patentability." Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 557, 18 Sup. Ct. 707, 716 (42 L. Ed. 1136). In Burr v. Duryee, 1 Wall. 531, 570 (17 L. Ed. 650), the Supreme Court of the United States in discussing the elements of a mechanism and its mode of operation said:

"A machine is a concrete thing, consisting of parts or of certain devices and combination of devices. The principle of a machine is properly defined to be 'its mode of operation,' or that peculiar combination of devices which distinguish it from other machines. A machine is not a principle or an idea. The use of ill-defined abstract phraseology is the frequent source of error. It requires no great ingenuity to mystify a subject by the use of abstract terms of indefinite or equivocal meaning. Because the law requires a patentee to explain the mode of operation of his peculiar machine, which distinguishes it from others, it does not authorize a patent for a 'mode of operation as exhibited in a machine.' Much less can any inference be drawn from the statute that an inventor who has made an improvement in a machine, and thus effects the desired result in a better, or cheaper manner than before, can include all previous inventions, and have a claim to the whole art, discovery, or machine which he has improved."

[5] The question, then, to be determined in this case is this: Of what new and useful elements does complainant's process consist, considered apart and independently of the apparatus or instrumentalities used in carrying it into effect?

Referring now to the process as described in the claims and substantially set forth in and illustrated by the specification, we find that the process of applying currents of warm air for heating purposes and currents of cool air for cooling purposes are specifically described as the functions of the heater and cooler for which application for a patent was made by Forsyth on September 30, 1897. But the specification goes further, and declares that "known forms of driers may be used for heating the fruit and known forms of cooling apparatus may be used for cooling the fruit." In view of this declaration in the specification, we do not deem it necessary to dwell now on this feature of the process. But we do find that there are two paragraphs in the

specification illustrating a feature of the art or process of heating and cooling raisins, which should be considered. These features are described as follows:

"1st. In some instances the temperature may be raised as high as 150° Fahrenheit, more or less, the degree of heat being governed to some extent by the duration of the treatment and a temperature in the neighborhood of 100° Fahrenheit or lower being at times sufficient, if sufficiently prolonged."

There was evidence introduced tending to show that a chemical change takes place in the raisins when subjected to this temperature, but this is clearly the operative effect of the treatment with which we have nothing to do, except to be informed of its usefulness; whether it is new or novel will be considered later.

The second feature is:

"After the proper condition of the raisins has been reached, they should be transferred to the cooler, where they will be quickly cooled to a temperature in the neighborhood of normal temperature, or lower, and will thereby be brought to a hard and brittle condition and the points of attachment of their stems made brittle. This hard and brittle condition will continue only for a limited time, and the stemming and cleaning should therefore be performed promptly or within a few hours."

Then follows a reference to a process of stemming and cleaning which is clearly the function of the stemming and cleaning apparatus, and no part of the process, and is not so claimed.

We come now to the question: What was the state of the art with respect to these features of the process at the time Forsyth applied for his patent for the process under consideration?

In the court below Edwin Hayden was called as a witness for the defendant. He testified as to his experience in drying raisins. His testimony reduced to a narrative form, is substantially as follows:

"I was engaged in the dried fruit business at 818 Battery street, San Francisco, from 1880 to 1893, renovating all kinds of fruits, prunes, peaches, raisins, pears, nectarines, pale plums, and, in fact, every kind of fruit. Raisins came to us in bags and boxes. We received large quantities of raisins in sacks that had been sweated, and some of them were mildewed, and necessitated the breaking up of the layers and redrying, and the ragged bunches were stemmed and the good bunches were put back in the boxes to form the layers again. The first step was the overhauling of the raisins. Those that were damp went into the dryer and were redried. The dryer was a Plummer dryer. It was a number of shelves upon which we placed the trays, and the heat came from below in a large furnace. The time the raisins were left in the dryer depended upon the amount of heat and the consistency of the fruit. Some raisins would be a little damp and others would be very wet, so wet that they would almost drip, and they were very soft, so soft that it was impossible to stem them or put them back in the envelope. When we took the raisins out of the dryer, they had to be cooled off before being sent the stemmer. The raisins were cooled mostly by natural draught. Our factory was about 100 feet long. The raisin room was in the upper part, the second story. The first story was devoted to the dryer, and I allowed the heat to pass through the dryer, and up to what I called the hot room, and there the raisins were distributed upon trays, and, when they had sufficiently dried, all the doors were opened and the cars run out. I had them on cars, and the cars were run into this long room, and the natural draught we have in San Francisco, generally between 11 and 4 o'clock every day, was sufficient to cool the raisins off, and to cause the stems to stiffen up so they could be freed from the berry. We also employed artificial means for cooling

;the raisins. We had a blower, and, if I was in a hurry with the raisins, I would put the blower on them. I could do as much work with the blower in one hour's time as I could do in half a day with the natural draught. Sometimes I did not use the blower at all. It was not necessary in every case. Sometimes the raisins would be sufficiently dried in the dryer with the natural draught—sufficiently dry to stem without using the blower. We used the blower off and on. The purpose of the blower was to expedite matters. Never perceived any difference in the treatment of raisins when cooled off naturally and when cooled by the blower. The effect of treating the raisins by artificial heat was to destroy the granulating power of the saccharine substance in the raisins. It prevented the raisin from sugaring. After the raisins were cooled, we ran them through the stemmer, and made loose raisins of them. We used the Fresno stemmer. That was a wire cone in a wire cylinder, and the inner cone revolved, and the outer cone was stationary. It would stem the raisins. It would take off a great many of the cap or butt stems. We did not have at that time any necessity for taking off the cap stems, any more than for the looks of them. It made them more salable. If the raisins were very dry, about 40 per cent. of the cap stems would be removed."

Thomas J. Little was also called as a witness on behalf of the defendant. His testimony, reduced to a narrative form, is substantially as follows:

"I was employed by Edwin Hayden from 1884 to 1895; employed about 9 or 10 years. Hayden was engaged in the drying and evaporating of fruits, and renovating fruits, including raisins. The method employed by Hayden for drying raisins was the drying process. The raisins that came in was what we call London layers, done up in papers, and the papers were all wet, and everything of that kind, and we would have to take them out of the papers and then we would pick out the best, and then we would put them back in the boxes as London layers, and what would not make London layers we would run through the stemming machine, and make loose muscatels of them. The building where this was carried on consisted of two stories and the basement or furnace. On the first floor was the dryer, and the second floor was used as a hot room, and we had trapdoors in the top of the dryer that opened into the hot room, and the hot room was fixed with racks all around it, three feet from the floor, and we used trays to fit in these racks. We spread the raisins on these trays, and then opened the trapdoors, and let the heat come up to the raisins. The heat right in the dryer would be too strong for the raisins. It would spoil them. When the raisins were properly dried, we would take them out and pick out the best, and would make London layers again. We had a lot of girls to pack them up, and those not fit for the purpose of packing would be run through the stemmer, and we would make what we called loose muscatels of them. After they were taken out of the hot room, we put them in these racks. These racks were made on casters to roll anywhere, and I think they would hold 24 trays, something in that neighborhood, and they were taken out of the dry room and pushed up where the draught would get to them to cool them before they were stemmed. It would not do to stem them with the heat on. They had to cool off to make the stems brittle. To make a draught we would take a window out there and then open the door, and set the trays in between them, and that would let a draught run right through; or we would take and run them through the fan-mill. We sometimes used a fan-mill. We would cool them with a blower, and while going around it would make quick work. The blower was a machine. They had a wheel with a shaft on with a pulley attached, and by putting the belt on the flywheel, and keeping that flying around with an engine, made a draught. We used this at times; not all the time. The purpose of using the machine was to make quick work. By natural draught it would take four or five hours to cool the raisins, and with the fan-mill two or three hours. Lots of the raisins were stemmed—tons and tons of them. The stemmer was a cone-shaped arrangement. It was a wire cone inside another cone, as near as I can tell, four or five feet long, and two

feet at one end, and about a foot at the other. The stems were taken off. The cylinder revolved and carried the raisins down, and as the raisins went down it was tearing the stems off. That was to remove the stems and the dirt or anything else that was on them. It acted as a sieve, and it even segregated what we call the sultanas from the other raisins. It removed a big part of the butt-stems from the raisins. The purpose of heating the raisins was to put them in shape to be salable. When they came in, they were all wet, and would not be salable at all. The heat would melt the sugar so you could not see it, and make the raisins look natural. We cooled the raisins to get the stems brittle so we could stem them. When the raisins came out of the hot room, whatever sugar was on the face of them would melt off, and the stems were so that when we started to cool them they would become brittle. Take the raisins when they were all sweated and wet, as a matter of course the stems are limber and soft, and we could not do anything with them in the stemmer machine, as it would tear the raisins all to pieces before we could stem them. When they came out of the heater, they were soft; and it was necessary to cool them. In cooling they stiffened up."

The testimony of these two witnesses is vigorously assailed and criticised by the appellant for several reasons, among others, that their testimony is dependent on the frailty of human memory; that the process used by them was not made public; and that the process was abandoned. Perhaps standing alone this testimony ought not to be held sufficient to overcome the prima facie evidence of novelty and invention furnished by the letters patent to Forsyth; but there is evidence in the record that is not open to these objections. Evidence of this character is the book of Gustav Eisen, entitled:

"The Raisin Industry. A Practical Treatise on the Raisin, Grapes, Their History, Culture and Curing, published by H. S. Crocker & Co., Stationers and Printers, 1890."

This book was issued from the press eight years before Forsyth made application for his patent for the process in controversy. The author makes many suggestions for the handling and treating of raisins, and describes the mechanism of drying, stemming, and grading machines used for that purpose. In describing the process of treating raisins, the author says:

"The loose raisins, provided they are properly or sufficiently dried, are ready to be handled as soon as brought from the vineyard. A loose raisin, or a bunch from which loose raisins are to be made, must be overdried rather than underdried; at any rate, it must be so dry that no juice will come out of it when the raisin is squeezed heavily or even torn. But a matter of greater importance even is that the stems should be brittle or sufficiently dry to break off readily. If they do not break, the raisins cannot be easily separated from the stem. The stem, instead of breaking off, will tear off, and the raisins will be open to the entrance of air, which will cause them to undergo a chemical change, to sugar and deteriorate. As soon as a perfectly dried sweat box of third-grade or loose raisins enters the packing house, it should be taken to the stemmer. Any delay in this is injurious to the raisins, as they will rapidly undergo a sweating or equalizing, causing the steams to soften and to lose their brittleness."

We have here the heating and cooling process to the same effect, and in very much the same language, as that employed in the Forsyth specification. Furthermore, reference is made to the chemical change in the contents of the grape, which is made an important feature in the evidence and argument supporting the Forsyth patent. The fact

is also stated that the treatment produces brittle stems, which is also claimed to be an important feature in the Forsyth process.

Evidence of prior inventions in the same department of industry is also important in showing the state of the art. It appears that on September 8, 1885, a patent was granted to Ambrose Blatchly and Andrew J. Hatch for a desiccating or drying apparatus which subjected fruit in trays to a current of warm air from a furnace for the purpose of drying the fruit, and that on November 29, 1887, Ambrose Blatchly was granted a patent for an improvement in fruit dryers, consisting of a heater and blowing or draft mechanism, by which the air was caused to flow through and over trays of fruit. These two patents are for mechanical devices, and not processes, but they show that the process of treating fruit with currents "of hot air" was in the stage of a mechanical function when Forsyth applied for his patent.

The case of Mowry v. Whitney, 81 U. S. (14 Wall.) 620, 20 L. Ed. 860, is cited by the appellant as being a parallel case supporting the novelty of the process in controversy. The process there involved the application of heat in the manufacture of cast-iron car wheels. The car wheel is there represented as consisting of an outer rim, a central hub, and a circular plate. It is there stated that it was essential that the rim should be hard because it had to endure friction in moving over the rails of the track, while the hub and plate must be soft and tough because they had to resist strain. The problem was to produce a car wheel having a hard rim and a soft hub and plate; but, as all the parts of the wheel were cast in one piece, the problem was difficult of accomplishment. The unequal cooling of the different parts produced a strain on the different parts which greatly impaired the strength of the wheel. Various devices had been made to guard against and to remedy the mischief resulting from the inherent and inevitable strain, caused by the unequal contraction in cooling. But it does not appear that in any of them the idea existed of making a car wheel with chilled tread, straight plates, and solid hub, annealed and cooled so as to leave it uninjured by the strain attendant upon the unequal cooling of the thick and thin parts. Annealing of some kinds of castings was known and practiced, but it does not appear to have ever been applied to cast-iron car wheels prior to the discovery made by Whitney of a process by which annealing could be applied successfully to car wheels. It was a new and novel process as applied to car wheels. As stated by the Supreme Court in its opinion:

"A new and previously unknown result is obtained, namely, the relief of the plate of the wheels from inherent strain without impairing the chilled tread, a result which, though anxiously sought, had not been obtained before Whitney's invention."

We do not see how the novelty of the process in that case, which was not before known, can be said to sustain the novelty of the process in this case. The application of heat and the process of cooling had been applied to dried fruit and raisins long before Forsyth made the application for a patent for his process and the process was substantially the same. What Forsyth really did was to devise and secure from others efficient apparatus and appliances for the treating and

curing of raisins, and the complainant as the present owner of such apparatus and appliances is entitled to all the advantages pertaining to their use and ownership as mechanical inventions, but that does not give the complainant the exclusive right to their operative effect as a process. The state of the art as appears from the testimony of Hayden and Little, and described in the Eisen book, and as appears from the fruit dryer patents in evidence was certainly very close to the art or process described and claimed in the Forsyth patent—so close, indeed, that it does not appear that there was any field for discovery or invention in passing from one to the other.

We concur in the opinion of the court below that the patent in suit is void for lack of novelty.

The decree of the court is therefore affirmed.

WOLVERTON, District Judge. I concur.